0IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRETT T. CULVER,                         :
    Plaintiff              :  CIVIL NO. 1:11-CV-02205
             :
 v.                                  :  (Judge Kane)
             :
JAMES SPECTER, et al.,                   :
    Defendants            :

## MEMORANDUM

The instant civil rights action was filed pursuant to 42 U.S.C. § 1983 by Brett T. Culver,

a former inmate at the State Correctional Institution at Mahanoy ("SCI-Mahanoy") in Frackville,

Pennsylvania.  In his complaint, Plaintiff alleges that employees at SCI-Mahanoy failed to

protect him from an assault by another inmate and that he was denied adequate medical care

following the assault in violation of the Eighth Amendment.  Presently before this Court are

motions for summary judgment filed by Defendants Gustitus and Lisiak (Doc. No. 290),

Defendant Specter (Doc. No. 294), and Corrections Defendants (Doc. No. 331).  Also before the

Court is a motion to supplement the complaint filed by Plaintiff.  (Doc. No. 305.)  For the

following reasons, the motion to supplement the complaint will be denied and the motions for

summary judgment will be granted.

## I. Background

Plaintiff claims that on December 3, 2009, while confined at SCI-Mahanoy, he was

assaulted by a fellow inmate, C. Wright, and suffered a broken jaw as a result.  (Doc. No. 1-1 at

4.)  Plaintiff claims that the assault occurred because Unit Manager Muick and Counselor

Marhelko had informed the inmate that Plaintiff had made complaints against him.  (Id.)

Plaintiff then reported to the infarmy and was seen by Corrections Dentist Moczulski.  (Id.)

Plaintiff was then transported for treatment by an outside oral surgeon, James Specter, who had

Plaintiff admitted to the Wilkes-Barre General Hospital.  (Id.)  The following day, Dr. Specter

performed oral surgery on Plaintiff but, according to Plaintiff, failed to detect certain fractures in

his jawbone and left them untreated.  (Id.)

Once Plaintiff returned to SCI-Mahanoy, he claims that he made several complaints

about the pain he was experiencing and that his jaw was visibly in need of further care.  (Id.)

The prison's medical staff allegedly ignored his complaints and continued to subject him to

improper medical care for his broken jaw.  (Id.)  At this time, Plaintiff was also prescribed a

pureed "prepared food diet," but was given this food on an inconsistent basis and, as a result,

Plaintiff claims that he suffered inadequate nutrition and weight loss.  (Id.)

On January 7, 2010, Plaintiff returned to Dr. Specter's office, where Specter removed the

wires and anchors in his jaw and informed Plaintiff that his treatment was complete.  (Id. at 5.)

Although Plaintiff complained that he was still in pain and he believed there were still fractures

in his jaw, Specter did not perform any x-rays or treat Plaintiff further.  (Id.)  When Plaintiff

returned to SCI-Mahanoy, he complained that he still had unrepaired sections of his jaw and was

still in pain, but he was nonetheless discharged back to the general population and prison staff

ceased giving him pureed meals.  (Id.)  The next day, Plaintiff reported to the medical

department and complained again of his jaw pain and inability to properly speak or eat, but his

complaints were disregarded.  (Id.)  On January 12, 2010, Plaintiff again returned to the medical

department with the same complaints, and again those complaints were disregarded.  (Id.)

On January 13, 2010, Plaintiff again returned to the medical department and requested x-

rays to determine whether he in fact still had fractures in his jaw.  (Id.)  The medical staff

conducted x-rays and confirmed that Plaintiff in fact had un-repaired fractures in his jaw and

admitted Plaintiff to the infirmary.  (Id.)  Although Plaintiff was again prescribed a diet of

pureed food, he claims that Defendant Stanitis neglected to consistently provide him this food.

(Id. at 5–6.)  On January 13, 2010, Plaintiff filed a grievance alleging that Defendant Stanitis was

not providing him with his prescribed diet.  (Id. at 6.)  The next day, Plaintiff was visited by

Defendant Stanitis and Defendant Alice Chipriano, the Medical Department Health Care

Administrator, who told Plaintiff that they would ensure that he received his prescribed food if

he would "sign off" on the grievance he filed.  (Id.)  Plaintiff did so, but the problem continued

the next day.  (Id.)

On January 28, 2010, Plaintiff was taken to Dr. Specter's office over his objections.  (Id.)

Plaintiff tried to explain to Specter how there were fractures in his jaw that had not been

addressed during his last surgery and requested that Specter take additional x-rays.  (Id.)  Specter

disregarded Plaintiff's complaints and stated that those fractures "did not exist."  (Id.)  Specter

nonetheless sedated Plaintiff again and conducted surgery on his jaw, committing the same

errors as he did the first time but installed even worse wiring and anchoring devices.  (Id.)

Plaintiff's jaw was pulled and harnessed approximately one inch to the left of its natural position.

(Id. at 7.)

When Plaintiff returned to SCI-Mahanoy, he complained that Dr. Specter had again

failed to repair his injuries and that he was in a state of excruciating pain as a result of his jaw

being wired into an unnatural position.  (Id.)  His complaints were ignored.  (Id.)  On February 3,

2010, Plaintiff told Defendant Dr. Lisiak about the problems and asked if he could be referred to

treatment by a sports injury specialist.  (Id.)  Dr. Lisiak denied his request.  (Id.)  On February 8,

2010, Plaintiff complained to Defendant Dr. Gustitus about his problems with his jaw and asked

to be referred to a sports injury specialist, but Dr. Gustitus also denied his request.  (<u>Id.</u> at 8.)
During this time, Plaintiff continued to suffer from a lack of the pureed food he had been
prescribed, and on February 10, 2010, he submitted another grievance about this.  (<u>Id.</u>)

On February 16, 2010, Plaintiff was again sent to Dr. Specter over his objections.  (<u>Id.</u>)
Plaintiff explained to Specter his complaints regarding the condition of his jaw and the manner
in which it had been wired.  (<u>Id.</u>)  Specter refused to treat any of the problems Plaintiff
described.  (<u>Id.</u>)  On that same day, Plaintiff also petitioned Defendant Dr. Moczulski to have
pictures taken of his jaw and the procedures that Specter had conducted, but this petition was
rejected.  (<u>Id.</u>)  On February 19, 2010, Plaintiff complained to Dr. Moczulski about the treatment
he had received and the pain he was experiencing due to the state of his jaw, and requested to be
seen by a sports injury specialist.  (<u>Id.</u> at 8–9.)  Moczulski refused to intervene in Plaintiff's
treatment.  (<u>Id.</u> at 8–9.)

On March 5, 2010, Plaintiff was again sent to Dr. Specter for treatment over his
objections.  (<u>Id.</u> at 9.)  Plaintiff again made the same complaints to Specter, explained why he
thought his jawbone needed to be re-set, explained that he thought his teeth were being pulled
and contorted by the faulty wiring,  and complained about the pain he was in, but Specter
disregarded his complaints.  (<u>Id.</u>)  Instead, Specter conducted a procedure that involved a
tightening of the wires in Plaintiff's mouth, which became so taut that they began to snap apart
several hours after the procedure was complete.  (<u>Id.</u>)  When Plaintiff returned to SCI-Mahanoy,
he immediately reported that the procedure Specter had just conducted was causing him extreme
pain, but prison officials denied him any medical intervention.  (<u>Id.</u>)  On March 7, 2010, Plaintiff
told SCI-Mahanoy medical staff that he was in a state of excruciating pain due to the manner in

which his jaw was wired shut, and that the wires were breaking from being excessively tightened.  (Id.)  The medical staff again refused any intervention.  (Id.)  On March 8, 2010, he told Dr. Gustitus the same thing, and Gustitus disregarded his complaint.  (Id.)  The next day, Plaintiff reported to Dr. Moczulski that his initial fractures were never correctly repaired and that the wiring of his jaw was straining his teeth and causing extreme pain.  (Id. at 10.)  Plaintiff requested x-rays and medical intervention, but Moczulski denied his requests.  (Id.)

On March 9, 2010, Plaintiff was again sent to Dr. Specter's office over his objections. (Id.)  Plaintiff complained to Specter of the problems he was experiencing because of the manner in which his jaw was wired, but Specter insisted that Plaintiff's teeth would realign on their own once the wiring was removed.  (Id.)  Specter then removed the wires from Plaintiff's jaw, but left the framing devices anchored to Plaintiff's roots, as he planned to remove those upon Plaintiff's return on March 23.  (Id.)  After returning to SCI-Mahanoy, Plaintiff again complained to SCI-Mahanoy medical staff, including Drs. Lisiak and Moczulski, of the problems he had experienced due to Specter's treatment, including that the remaining framing devices were causing him pain, but they again refused to change or otherwise intervene in his treatment plan. (Id.)

On March 23, 2010, Plaintiff was forced to return to Dr. Specter's office over his objections.  (Id. at 11.)  Plaintiff told Specter that, since his jawbone had been forced to mend improperly, it would need to be re-broken so it could be properly set, but Specter insisted that they were now fully mended and that his teeth were in perfect alignment.  (Id.)  Then, rather than removing the frames from Plaintiff's jaw, Specter again wired Plaintiff's jaws shut in the same fashion as he had done previously.  (Id.)  When Plaintiff returned to SCI-Mahanoy he again

pleaded with medical staff, including Dr. Lisiak, for some form of medical intervention, as the incorrect wiring of his jaw was causing ongoing pain and further damage, but his pleas were disregarded.  (Id.)

On April 15, 2010, Plaintiff was again sent back to Dr. Specter's office, despite his objections.  (Id. at 12.)  Specter then removed the wires from Plaintiff's mouth without the use of anesthetic.  (Id.)  At this point, Plaintiff realized that Specter had wired certain frames to Plaintiff's bridge, which had resulted in damage to the bridge.  (Id.)  After removing the wires, Specter told Plaintiff that the procedures were finished and that his teeth were in perfect alignment.  (Id.)

Upon returning to SCI-Mahanoy, Plaintiff again approached Dr. Lisiak about the damage that had been caused to his mouth by Specter's treatment, but Lisiak disregarded his complaints and discharged him from the infirmary.  (Id.)  On April 20, 2010, Plaintiff approached Dr. Moczulski about the harm caused by Specter's treatments, and Moczulski scheduled an appointment for Plaintiff with a maxillofacial surgeon.  (Id. at 13.)  The next day, Plaintiff reported to the medical department to complain of extreme pain and requested medical treatment and a soft food diet, but his requests were denied.  (Id.)

On May 31, 2010, Plaintiff was examined by a maxillofacial surgeon.  (Id.)  On June 25, 2010, apparently following up on the findings of the maxillofacial surgeon,  Dr. Moczulski filed down Plaintiff's teeth on the right side of his mouth in an attempt to correct their alignment.  (Id.)  During this time, and continuing well into the next year, Plaintiff continued reporting to the medical department for sick-call to complain about problems with his jaw, but was told that he could no longer report problems relating to his jaw at the sick-call.  (Id.)  On August 4, 2011,

after attending sick-call once again to complain about his jaw, Plaintiff was told that he was not

permitted to report for those issues.  (Id. at 14.)  After this instance, the medical department

began withholding prescribed pain medication from Plaintiff, yet charged his account for the

medication.  (Id.)

On November 11, 2011, Plaintiff filed the instant complaint against Dr. Specter and

several employees of SCI-Mahanoy.  (See Doc. No. 1)  A long and convoluted series of pre-trial

motions followed, during which this court dismissed certain portions of the complaint, including

any negligence claims raised under the Eighth Amendment against Defendant Specter, any

claims raised under the Fourteenth Amendment against Defendant Specter, all of Plaintiff's

claims regarding the denials of his grievances, and all claims against Defendant Corizon.  (See

Doc. Nos. 81, 115.)  Presently before the court are motions for summary judgment filed by

Defendants Gustitus and Lisiak (Doc. No. 290), Defendant Specter (Doc. No. 294), and

Corrections Defendants (Doc. No. 331).  Also before the court is a motion to supplement the

complaint filed by Plaintiff.  (Doc. No. 305.)  These motions are now fully briefed and ripe for

decision.

## II.   Legal Standard

### A.   Motion for Summary Judgment

Summary judgment may be granted if, drawing all inferences in favor of the non-moving

party, "the movant shows that there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); see also Melrose, Inc. v.

Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010).  A fact is "material" if proof of its existence or

non-existence might affect the outcome of the suit under applicable law.  Anderson v. Liberty

Lobby Inc., 477 U.S. 242, 248 (1986); see also Lamont v. New Jersey, 637 F.3d 177, 181 (3d

Cir. 2011).  Disputes must be both (1) material, meaning concerning facts that will affect the

outcome of the issue under substantive law, and (2) genuine, meaning there is sufficient evidence

supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  In re Lemington Home for Aged, 659 F.3d 282, 290 (3d Cir.

2011); see also S.H. ex rel. Durrell v. Lower Merion School Dist., 729 F.3d 248, 256 (3d Cir.

2013).  "A genuine dispute is one that 'may reasonably be resolved in favor of either party.'"

Lomando v. United States, 667 F.3d 363, 371 (3d Cir. 2011) (quoting Anderson, 477 U.S. at

250).

A party moving for summary judgment has the initial burden of supporting its assertion

that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the

record—i.e., depositions, documents, affidavits, stipulations, or other materials— or by showing

that: (1) the materials cited by the non-moving party do not establish the presence of a genuine

dispute, or (2) that the non-moving party cannot produce admissible evidence to support its

fact(s).  Fed.R.Civ.P. 56(c)(1).  The moving party may discharge its burden by "pointing out to

the district court" the "absence of evidence to support the nonmoving party's case" when the

nonmoving party bears the ultimate burden of proof for the claim in question.  Conoshenti v.

Public Service Elec. & Gas Co, 364 F.3d 135, 140 (3d Cir. 2004) (quoting Singletary v.

Pennsylvania Dept. of Corrections, 266 F.3d 186, 192 n.2 (3d Cir. 2001)).

Conversely, in order to defeat a motion for summary judgment, the non-moving party

must support its assertion that fact(s) are genuinely disputed by citing to particular parts of

materials in the record, or by showing that: (1) the materials cited by the moving party do not

establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s).  Fed.R.Civ.P. 56(c)(1).  When determining whether there are any genuine issues of material fact, the court "should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  S.H. v. Lower Merion School Dist., 729 F.3d at 256.  In reviewing a motion for summary judgment, the court does not make credibility determinations, and summary judgment is "inappropriate when a case will turn on credibility determinations."  El v. Se. Pa. Transp. Auth., 479 F.3d 232, 237 (3d Cir. 2007) (quoting Horowitz v. Fed. Kemper Life Assur. Co., 57 F.3d 300, 302 n.1 (3d. Cir. 1995)).

### B.    Supplemental Pleadings

A district court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented" even in situations where "the original pleading is defective in stating a claim." Fed. R. Civ. P. 15(d).  A determination of whether to grant leave to file a supplemental pleading is left to the sound discretion of the district court.  Owens-Illinois, Inc. v. Lake Sore Land Co., Inc., 610 F.2d 1185, 1188-89 (3d Cir. 1979); see also Crosby v. Piazza, 465 F. App'x 168, 174 (3d Cir. 2012).

In determining whether to grant leave to file a supplemental pleading, district courts should apply a similar standard as that used in determining whether to grant leave to amend. See Wallace v. Abell, 318 F. App'x 96, 99 (3d Cir. 2009); see also 6A Charles Alan Wright, et al., Federal Practice & Procedure § 1504 (3d ed. 2015) (noting that the discretion exercised by the court is "similar" to that exercised in deciding whether to grant leave to amend).  Thus, leave to supplement a pleading should generally be granted unless "equitable considerations render it

otherwise unjust." <u>Arthur v. Maersk, Inc.</u>, 434 F.3d 196, 204 (3d Cir. 2006) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).  Equitable considerations that may justify refusal of leave to supplement include "undue delay, bad faith, and futility."  <u>Id</u>.  Finally, a supplemental complaint filed by a prisoner proceeding <u>in forma pauperis</u> is subject to the screening standards of the Prison Litigation Reform Act ("PLRA") in the same manner as an original complaint.  <u>See</u> 28 U.S.C. §§ 1915A, 1915(e)(2); <u>see also</u> <u>Stringer v. Bureau of Prisons</u>, 145 F. App'x 751 (3d Cir. 2005) (affirming <u>sua sponte</u> dismissal of supplemental complaint along with original complaint).

## III.   <u>Discussion</u>

Plaintiff's complaint sets forth the following remaining claims:

1) Defendants Muick and Marhelko retaliated against Plaintiff by notifying a fellow inmate of Plaintiff's complaints against him, in violation of Plaintiff's First Amendment rights;

2) Defendants Muick and Marhelko violated Plaintiff's Eighth Amendment rights by notifying a fellow inmate that he was a "snitch," thereby creating unsafe conditions of confinement;

3) Defendants Muick and Marhelko violated Plaintiff's Eighth Amendment rights by subsequently failing to protect him from an attack by that inmate;

4) Defendant Specter violated Plaintiff's Eighth Amendment rights by acting with deliberate indifference toward Plaintiff's serious medical needs;

5) Defendants Chipriano, Moczulski, Lisiak, and Gustitus violated Plaintiff's Eighth Amendment rights by acting with deliberate indifference toward Plaintiff's serious

medical needs;

6) Defendant Stanitis violated Plaintiff's Eighth Amendment rights by failing to provide

him with adequate nutrition;

7) All Defendants acted with medical negligence by failing to provide Plaintiff with

proper medical care;

(Doc. No. 1-1 at 14–16.)[1]  In his proposed supplemental complaint, Plaintiff seeks to add Dr.

William Chung as a defendant and seeks to press various claims regarding Chung's alleged

obstruction of Plaintiff's discovery requests.  (Doc. No. 305-1.)  This court will first address the

Defendants' motions for summary judgment before turning to Plaintiff's motion to supplement

the complaint.

### A.      Lisiak and Gustitus's Motion for Summary Judgment

Defendants Lisiak and Gustitus argue that Plaintiff failed to exhaust his administrative

remedies for his Eighth Amendment claim against them and that Plaintiff has also failed to

adduce sufficient evidence to show that they violated his Eighth Amendment rights or committed

medical negligence in their care for him.  (Doc. No. 292 at 6–13.)  This court will first address

their administrative remedies argument before examining whether Plaintiff has produced

sufficient evidence to support his Eighth Amendment claims.  Because this court will ultimately

dismiss all of Plaintiff's federal claims, it will decline to exercise supplemental jurisdiction over

---

[1] Plaintiff also states that all named Defendants violated his Fourteenth Amendment rights by failing to
provide him with "his proper due process rights" when he was "retaliated against, assaulted, received
head trauma, denied appropriate and/or corrective medical treatments, duration of 'and' abandonment to
suffer of extreme pain conditions indefinitely."  (Doc. No. 1-1 at 16.)  To the extent that Plaintiff is here
attempting to set forth a claim regarding the prison's grievance procedure, that claim has already been
dismissed by this court.  (See Doc. No. 115.)  To the extent Plaintiff was otherwise attempting to restate
his Eighth Amendment claims as a Fourteenth Amendment claim, he has failed to state a claim in this
regard.  See Hubbard v. Taylor, 399 F.3d 150, 158 (3d Cir. 2005).

his state law claims of medical malpractice.  (See infra at III.D.)

### i.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), prisoners who wish to bring a civil

action alleging that the conditions of their confinement violate federal law must first exhaust all

available administrative remedies.  42 U.S.C. § 1997e.  This requirement is mandatory and not

left to the discretion of the district court.  Woodford v. Ngo, 548 U.S. 81, 85 (2006) (citing

Booth v. Churner, 532 U.S. 731, 734 (2001)).  Prisoners must exhaust all available remedies with

respect to each claim even when those remedies cannot grant the relief the prisoner seeks.  Id.

Although mandatory, this requirement is not jurisdictional, but instead operates as an affirmative

defense that must be pleaded and proved by the defendants.  Ray v. Kertes, 285 F.3d 287,

291–95 (3d Cir. 2002).  A party can only obtain summary judgment on the ground of an

affirmative defense by supporting their motion with evidence "that would entitle [it] to a directed

verdict if not controverted at trial."  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  Once the party

makes this showing, "it is entitled to summary judgment unless the non-moving party comes

forward with probative evidence that would demonstrate the existence of a triable issue of fact."

Id.

The Pennsylvania Department of Corrections maintains a three-step procedure for the

resolution of inmate grievances, published under policy number DC-ADM 804.[2]  This procedure

requires that inmates must resolve any issues with the conditions of their confinement by first

---

[2] This policy is made publicly available on the Department's website and can be found at
http://www.cor.pa.gov/Administration/Documents/DOC Policies/804 Inmate Grievances.pdf.  As the
policy is not published in any official administrative register or compilation, this court will cite to specific
sections of the policy using the policy number and internal section numbering.

submitting a grievance for "Initial Review" to the Facility Grievance Coordinator using an official form "within 15 working days after the event upon which the claim is based."  DC-ADM 804 § 1(A)(9).  In the grievance, the inmate must "include a statement of the facts relevant to the claim," including the "date, approximate time and location of the event(s) that gave rise to the grievance) and the identity of any "individuals directly involved in the event(s)."  Id. at § 1(A)(12).  If the Grievance Coordinator's decision is unfavorable, the inmate may appeal the decision to the Facility Manager within 15 working days.  Id. at § 2(A)(1)(a).  If that appeal is unsuccessful, the inmate may then appeal to the Secretary's Office of Inmate Grievances and Appeals within 15 working days.  Id. at § 2(B)(1)(b).  After this appeal, the inmate has exhausted his available administrative remedies.

Defendants Gustitus and Lisiak argue that the record includes "no grievances directed against [them] for any harm that is the subject of this case."  (Doc. No. 292 at 12.)  Plaintiff does not address this argument in his brief in opposition to Defendants' motion for summary judgment.  (See Doc. No. 344.)  While Plaintiff plainly filed several grievances that complained of the inaction of SCI-Mahanoy "medical staff" (see Doc. Nos. 291-2–291-7), the mere mention of "medical staff" is not a sufficiently specific way of identifying a defendant for the purpose of exhausting Pennsylvania's administrative grievance procedure.  See Spruill v. Gills, 372 F.3d 218, 234-35 (3d Cir. 2004) (holding DC-ADM 804 requires inmates to name specific defendants in their grievances in order to exhaust administrative remedies against those defendants).  Thus, this court will look only to those grievances that specifically name Drs. Gustitus and/or Lisiak to determine whether Plaintiff has exhausted any claims against them.

In Grievance #306746, Plaintiff complained about the failure of SCI-Mahanoy medical

staff to take any action regarding the botched surgery performed by Dr. Specter.  (Doc. No. 291-3 at 11.)  In the grievance, Plaintiff makes a detailed list of his requests to the medical staff for aid, and states that on February 3, 2010, he made a request to "Dr. Lasiak" and that "no affirmative action was taken."  (Id.)  Despite Plaintiff's misspelling of Dr. Lisiak's name, this was sufficient to alert the administration that Dr. Lisiak was one of the targets of Plaintiff's grievance.  See Spruill, 372 F.3d at 234 ("The purpose of [the grievance procedure] is to put the prison officials on notice of the persons claimed to be guilty of wrongdoing.").  This grievance was appealed to the Secretary's Office and was denied.  (Doc. No. 291-3 at 4.)

None of Plaintiff's other grievances that were appealed through all stages properly name either Gustitus or Lisiak as a target of the grievance.[3]  (See Doc. nos. 291-2–291-7.)  Therefore, Plaintiff has failed to exhaust the available administrative remedies for his federal claim against Dr. Gustitus.  Because Grievance #306746 was appealed to the final stage of review, Plaintiff has successfully exhausted the available administrative remedies for his federal claim against Dr. Lisiak to the extent that his claim involves the same facts complained of in that grievance.

### ii.   Eighth Amendment Claim Against Dr. Lisiak

### a.   Legal Standard

In order to show that Dr. Lisiak violated Plaintiff's Eighth Amendment rights, Plaintiff

---

[3] In a document labeled a "Standing Grievance Supplemental" to Grievance #305153, Plaintiff did mention Dr. "Lasiak," stating that, although he had been repeatedly denied pain medication increases, "Dr. Lasiak finally prescribed [an] additional dosage."  (Doc. No. 291-2 at 6.)  However, since this supplemental filing was filed the day after Plaintiff's grievance was denied, the information contained within it would not count as part of the initial grievance, and thus fails to comply with DC-ADM 804 § 1(A)(12).  (See id. at 5–6.)  Moreover, even if this court were to accept that the supplemental filing qualified as part of the initial grievance, and also were to accept that this language was sufficient to indicate that Dr. Lisiak was a target of the grievance, the claims raised in this grievance are so similar to those raised in Grievance #306746 that it would not exhaust any additional federal claims against Dr. Lisiak.

14

must show that Lisiak acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97 (1976).  This involves two separate requirements: first, Plaintiff must provide evidence to show that his medical needs were in fact serious; second, Plaintiff must show that Lisiak's conduct toward Plaintiff qualified as deliberately indifferent.  Rouse v. Plantier, 183 F.3d 192, 197 (3d Cir. 1999) (citing Estelle, 429 U.S. at 106).  A medical need qualifies as serious where, for example: 1) it "has been diagnosed by a physician as requiring medical treatment," 2) it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention," or 3) the failure to treat the medical need "would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."   Atkinson v. Taylor, 316 F.3d 257, 272–73 (3d Cir. 2003) (internal quotations and citations omitted).  Deliberate indifference, in turn, is more than an "inadvertent failure to provide adequate medical care," and requires "'obduracy and wantonness' . . . which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk."  Rouse, 182 F.3d at 197 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).  The Third Circuit has identified several situations constituting deliberate indifference, including: the denial of reasonable requests for treatment, the intentional refusal to provide care that the authority knows is necessary, the delay of treatment for non-medical reasons, and the erection of arbitrary and burdensome procedural barriers to treatment.  Monmouth Cty. Corr. Institutional Inmates v. Lanzaro (MCCII), 834 F.2d 326, 346–47 (3d Cir. 1987).  By contrast, "mere allegations of malpractice" or "disagreement as to the proper medical treatment" do not constitute deliberate indifference.  Id.

### b.      Whether Plaintiff's Medical Need Was Serious

Lisiak argues that Plaintiff has failed to produce sufficient evidence to prove any element

of his Eighth Amendment claim.  According to Lisiak, without any expert witness testimony,

Plaintiff is unable to show any evidence that Specter's treatment of his broken jaw resulted in a

medical need that qualifies as "serious" under the Eighth Amendment, as the injuries he

complains of are not the sort that would be readily understood by laymen.  (Doc. No. 292 at

8–9.)  Similarly, Lisiak argues that Plaintiff has failed to produce any evidence to show that he

acted with deliberate indifference toward Plaintiff.  (Id. at 9–10.)  Because a determination of

whether Plaintiff can point to sufficient evidence to show that he had a serious medical need also

implicates the disposition of the motions for summary judgment filed by other defendants, this

court will address that issue first.

As mentioned previously, Plaintiff was referred to William Chung, a maxillofacial

surgeon, on June 1, 2010, for a second opinion after the completion of his treatment by Dr.

Specter.  (See Doc. No. 295-1.)  Dr. Chung diagnosed Plaintiff with "malocclusion," that is, the

imperfect alignment of his teeth upon closing his jaw, as a result of the fracturing of his jaw.  (Id.

at 2.)  Dr. Chung also noted that Plaintiff was complaining of harm to his bridge caused by the

wiring of his jaw, but found "no obvious maladies" there.  (Id. at 1.)  Dr. Chung also noted that a

review of the x-rays showed healing of the fractures in his jaw, and that surgery would not

measurably alleviate the pain Plaintiff complained of.  (Id.)  Dr. Chung instead recommended

that Plaintiff be treated with occlusal equilibriation—a process whereby a small portion of a

patient's teeth are filed away in order to allow the teeth to align correctly—to correct the setting

of his jaw.  (Id.)

In early 2014, Plaintiff sent his dental records, including photographs and x-rays taken

over the course of his treatment, to Jeff A. Jageman, a dentist, to be reviewed for the purpose of

endorsing a certificate of merit for Plaintiff's medical malpractice claims.  (See Doc. No. 295-2 at 6.)  The photos sent to Dr. Jageman were taken at several points before, during and after the treatment of Dr. Specter.  (Doc. No. 335 at 4–15.)  Some of the photos taken around the time that Plaintiff complained to Dr. Lisiak show Plaintiff clenching his teeth with his lips open, revealing that his teeth are somewhat mis-aligned.  (Id. at 4–7.)  Jageman sent a letter back to Plaintiff stating that, in his opinion, Plaintiff was "treated below the acceptable professional standards for his injuries" and that he would "need corrective surgery to repair the damage done."  (Doc. No. 238 at 6.)  In his deposition, Jageman stated that, in his opinion, Plaintiff's teeth were "grossly out of contact" and that one side of his jaw was "not set properly" resulting in his teeth being "shifted in."  (Doc. No. 295-2 at 10.)

When viewed in the light most favorably to Plaintiff, Dr. Chung's medical records and Dr. Jageman's testimony tend to show that Plaintiff was suffering from a severe medical need at the time that he complained of Dr. Specter's treatment to Lisiak.  Both Dr. Chung, a maxillofacial surgeon, and Dr. Jageman, a dentist, stated that Plaintiff had a medical need that required treatment, which constitutes a severe medical need.  See Atkinson, 316 F.3d at 272–73. The fact that they disagreed on the extent of treatment required does not obviate the fact that they both recognized a medical need requiring treatment.  Furthermore, although their opinions were rendered years after the conduct that Plaintiff complained of in his grievance against Lisiak, Dr. Jageman's opinion was at least partially based on the photographs Plaintiff had taken around the time that he filed the grievance against Lisiak.  (See Doc. No. 295-2 at 9.)  A rational trier of fact could reasonably infer that Plaintiff was suffering from malocclusion at the time that Plaintiff approached Lisiak about it.  Thus, this court finds that there is a genuine issue of

material fact concerning whether Plaintiff was suffering a severe medical need at the time

relevant to his Eighth Amendment claim against Lisiak.

### c.        Whether Lisiak Acted With Deliberate Indifference

There remains the issue of whether there is admissible evidence in the record to show

that Lisiak acted with deliberate indifference.  Culver testified in his deposition that, when he

told Lisiak about his problems and showed him the issues he was having with the wiring of his

jaw, Lisiak stated there was nothing he could do because he was not an oral surgeon.  (Doc. No.

291-1 at 84.)  Plaintiff does not dispute the fact that Lisiak is a medical doctor and is not licensed

as a dentist or oral surgeon.  (Id. at 84–85.)  Plaintiff also admits that Lisiak prescribed him

Neurontin, Ultram, Tylenol, and Motrin at different times when he complained about suffering

pain, but nonetheless contends that this treatment was merely superficial.  (Id. at 84.)

Even when viewed in the light most favorable to Plaintiff, his testimony, medical records,

and the photographs of his mouth fail to support a conclusion that Lisiak acted with deliberate

indifference.  Lisiak may have failed to recognize that Dr. Specter's treatment was causing

Plaintiff's jaw to settle in an unnatural position, but there is nothing to indicate that this failure

was a result of deliberate indifference.  Lisiak told Plaintiff that he was not qualified to second-

guess the judgment of Plaintiff's oral surgeon (Id. at 85), and this refusal to alter an ongoing

treatment plan, especially one put in place by another medical professional with more specialized

training in the relevant field, falls well within the bounds of what is acceptable under the Eighth

Amendment.  See Estelle, 429 U.S. at 107 ("[T]he question of whether an X-ray or additional

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for

medical judgment."); Spruill, 372 F.3d at 235 ("Mere disagreement as to the proper medical

treatment is also insufficient") (internal quotation marks omitted).  While there is some evidence to show that Plaintiff had a serious medical need at the time that he approached Lisiak, Plaintiff offers no evidence from which to infer that Lisiak knew that Dr. Specter's treatment of that medical need was either ineffective or actively harmful.  Unless Lisiak had good reason to think that Specter's treatment was ineffective, his interference with Specter's treatment could itself have been considered deliberate indifference to Plaintiff's serious medical needs.  See White v. Napolean, 897 F.2d 103, 109–110 (3d Cir. 1990) (noting that the intentional interference with a prescribed course of treatment can constitute deliberate indifference).[4]

Thus, this court finds that there is no genuine issue of material fact concerning whether Defendant Lisiak acted with deliberate indifference and that Defendant Lisiak is entitled to summary judgment on this claim.

### B.      Specter's Motion for Summary Judgment

Defendant Specter moves for summary judgment on the ground that Plaintiff has failed to adduce sufficient evidence to establish either his Eighth Amendment or medical negligence claims against Specter.  (Doc. No. 296.)  Specifically, Specter argues that Plaintiff's Eighth Amendment claim fails because he provides no evidence to show that Specter acted with deliberate indifference in his treatment of Plaintiff, and that Plaintiff's medical negligence claim fails because Plaintiff has not obtained expert testimony to support his claim.  (Id.)  For the reasons that follow, this court will grant Specter's motion regarding Plaintiff's Eighth Amendment claim.  Because this court will ultimately dismiss all of Plaintiff's federal claims, it

---

[4] This court notes that, assuming the pain Plaintiff was experiencing was itself a serious medical need, it is undisputed that Lisiak ultimately offered treatment for that need.  (Doc. No. 291-1 at 84.)

will decline to exercise supplemental jurisdiction over his state law claims for medical

malpractice.  (See infra at III.D.)

### i.     Plaintiff's Eighth Amendment Claim Against Specter

Specter does not dispute that Plaintiff had a serious medical need at the time that he was

being treated by Specter, but instead argues that there is no evidence that he acted with deliberate

indifference toward that need.  (Id. at 3–8.)  Specter maintains that Plaintiff's claims essentially

amount to a disagreement over the proper course of treatment, which is not actionable under the

Eighth Amendment.  (Id.)  Plaintiff contends that his medical records show there is a genuine

issue of material fact concerning whether Defendant acted with deliberate indifference.  (Doc.

No. 345.)

As explained above (see supra Part III.A.ii.a), deliberate indifference is more than an

"inadvertent failure to provide adequate medical care," and requires "obduracy and wantonness .

. . which has been likened to conduct that includes recklessness or a conscious disregard of a

serious risk."  Rouse, 182 F.3d at 197 (internal quotation marks omitted).  Importantly, "mere

allegations of malpractice" or "disagreement as to the proper medical treatment" do not

constitute deliberate indifference.  MCCII, 834 F.2d at 346–47; see also Spruill, 372 F.3d at 235.

The only evidence in the record concerning Plaintiff's treatment by Specter is his own deposition

testimony, certain medical records, photographs of Plaintiff's face that purportedly show that his

jaw was grossly misaligned, a sworn declaration by Dr. Moczulski, and the deposition testimony

of Dr. Jageman.[5]  (See Doc. No. 291-1 at 47–82; Doc. No. 295-1;  Doc. No. 219 at 1–9; Doc. No.

---

[5] Plaintiff testified in his deposition that he intended to call two nurses from SCI-Mahanoy as witnesses at trial.  (Doc. No. 291-1 at 78.)  As Plaintiff has not provided any affidavits from these witnesses, he cannot use their hypothetical ability to testify in his favor at trial as grounds to establish a genuine dispute of material fact.  See Fed. R. Civ. P. 56(c)(1)(A).

295-2.) Even when viewed in the light most favorable to Plaintiff, a reasonable trier of fact could not infer from this evidence that Specter acted with deliberate indifference.

Plaintiff testified in his deposition that Specter attempted to correct his jaw by wiring it shut on three separate occasions, and that he had multiple other appointments where Specter would check on the status of his jaw. (Doc. No. 291-1 at 50–51, 61, 67.) During each of these visits, Plaintiff testified that Specter's general demeanor was "always rush, rush, rush," and that Specter was "always aggravated" and did not listen to what Plaintiff tried to tell him. (Id. at 52.) Plaintiff testified that when he tried to explain to Specter how his jaw had been incorrectly wired and how it should be placed in a more natural position, Specter "looked at [him] like [he] was crazy or something" and proceeded to ignore his advice. (Id. at 61.) Plaintiff testified that there is still a "bone sticking out" at an irregular angle on the side of his jaw that makes his jaw uneven, and that this is due to Specter's failure to mend a fracture that Specter denied even existed. (Id. at 72.) Plaintiff also testified that, during one of the procedures, Specter "wired the metal frames to the cast teeth roots" of his bridge, and that "when he was wrenching everything, trying to force some sort of setting without reconstructing the structure" of Plaintiff's jaw, Specter damaged the bridge, which has caused Plaintiff ongoing pain. (Id. at 71.) Plaintiff testified that he continues to experience pain "throughout [his] whole mouth" due to Specter's surgeries, for which he must take Neurontin. (Id. at 75.)

Dr. Moczulski, a dentist employed by SCI-Mahanoy, testified in a sworn declaration about the treatment Plaintiff received for his broken jaw, both from SCI-Mahanoy medical staff and outside surgeons. (Doc No. 338.) Moczulski stated that Plaintiff had a malocclusion prior to receiving any oral surgery by Dr. Specter. (Id. at 7.) On December 3, 2009, after Plaintiff

was assaulted, Moczulski diagnosed Plaintiff with a mandibular fracture and referred him to

Specter, who performed the closed reduction surgery the next day.  (Id. at 7–8.)  Moczulski

testified that Plaintiff's medical records show he had a total of ten consultations with Specter

after the initial surgery.  (Id. at 8.)

For the most part, these records corroborate Plaintiff's testimony regarding the essential

sequence of events in Specter's treatment of Plaintiff.  Specter removed the wires on January 7,

2010, believing the fracture to be healed.  (Id. at 33.)  On January 28, after noting that one of

Plaintiff's fractures remained, Specter re-fractured Plaintiff's lower jaw and rewired it shut.  (Id.

at 31.)  The record shows that Specter also saw Plaintiff on March 5 for a follow-up

appointment, but does not mention anything about Specter tightening the wires.  (Id. at 27.)  On

March 9, Specter removed the wires from Plaintiff's mouth and scheduled another appointment

to remove the arch bars.  (Id. at 26.)  On March 23, Specter noted that Plaintiff exhibited a

"slight[ly] open bite" that "deviat[ed] to [the] right," despite the fact that his fractures appeared

healed.  (Id. at 24.)  Specter wrote that he thought the apparent malocclusion was due to Plaintiff

purposely closing his jaw in such a way as to "make it" appear maloccluded.  (Id.)  Specter

nonetheless rewired Plaintiff's jaw and scheduled another follow-up appointment.  (Id.)  On

April 15, Specter noted that Plaintiff's occlusion was "good" and that the union of his jaw was

"stable."  (Id. at 22.)  Specter then removed the fixtures from his mouth and discharged Plaintiff.

(Id.)

On February 19, Moczulski personally evaluated the ongoing treatment performed by

Specter in response to a complaint by Plaintiff.  (Id. at 9–10.)  Moczulski testified that Plaintiff

had been complaining of "pain, [an] uneven bite and [an] uneven jaw on [his] left side."  (Id. at

22

9.)  Moczulski stated that Plaintiff's "concerns were unfounded;" "[t]he arch wires and legatures [sic] were well done and [his] maxilla aligned with the mandible as far as possible consistent with tooth position."  (Id. at 10.)  In Moczulski's written response to Plaintiff's request to have photographs taken of his jaw, he stated that Specter "did an exceptionally good job with the inter and intra-arch fixation and the jaw alignment is as good as it can be made to get."  (Id.) Moczulski opined that Plaintiff's pain "would probably diminish if [he]'d stop screwing around with the treatment and allow nature to take its course and allow everything to mend."  (Id.)

On May 4, 2010, Dr. Dino Angelici, the Chief of Dentistry at SCI-Mahanoy, examined Plaintiff and determined that his jaw was capable of closing in a proper alignment.  (Id. at 11.) However, because Plaintiff claimed that this position was nonetheless unnatural, Angelici referred Plaintiff to Dr. Bill Chung, another oral surgeon.  (Id.)  Dr. Chung found that Plaintiff's pain would "not necessarily" be alleviated by surgery, but that Plaintiff did still suffer from a malocclusion.  (Doc. No. 339 at 48.)  Chung recommended an occlusal equilibration and the retraining of Plaintiff's bite pattern.  (Doc. No. 339 at 48.)  Although Chung found "no obvious maladies" to Plaintiff's bridge, he also wrote that Plaintiff may require a "possible . . . redo of Maryland bridge."[6]  (Id.)  Moczulski had earlier also noted that Plaintiff's bridge "might have slightly lifted" from its original position and that it might have needed to be re-cemented in place.  (Doc. No. 338 at 12.)  However, when Moczulski examined Plaintiff again on June 25, 2010, to perform the occlusal equiliberiation, he found that the "bridge seemed intact and solid." (Id.)  Moczulski further found that Plaintiff's occlusion, even before the equilibriation, was "quite satisfactory considering [his] pre-existing malocclusion."  (Id.)

---

[6] The significance of this last note is not entirely clear, as a portion of the preceding text is unreadable.  (Id.; see also Doc. No. 338 at 12 (recitation of Dr. Chung's consultation record by Moczulski).)

The final significant piece of evidence in the record regarding Specter's treatment of Plaintiff is the deposition testimony of Dr. Jageman.  Jageman reviewed certain x-rays and photographs Plaintiff sent him at the behest of one of Jageman's relatives, who was at that time an inmate residing at the same institution as Plaintiff.  (Doc. No. 295-2 at 6.)  Aside from the x-rays and photographs, Jageman did not review any other medical records for Plaintiff.  (Id. at 4.)  On February 3, 2013, after reviewing the x-rays and photographs, Jageman wrote a letter for Plaintiff stating that, in his opinion, Plaintiff was "treated below the acceptable professional standards for his injuries."  (Id. at 28.)  At his deposition, Jageman testified that he was not aware that this letter was written in support of a certificate of merit for Plaintiff's lawsuit.  (Id. at 8–9.)  Nonetheless, Jageman testified that he still believed Plaintiff's oral surgeon had treated Plaintiff below the professional standard of care by performing a closed reduction surgery rather than an open reduction surgery.  (Id. at 10.)  Jageman based his opinion primarily on certain photographs in which Plaintiff's teeth appeared to be "grossly out of contact" when his jaw was shut.  (Id. at 9–10.)   Jageman stated that he did not believe someone could simply hold their jaw in such a manner as to make it appear that severely out of contact.  (Id. at 9.)  Jageman also stated that, based on the x-rays he reviewed, it appeared that Plaintiff's lower jaw was set improperly and that this caused some of his teeth to "shift in."  (Id. at 10.)  Jageman admitted that, as a dentist, he was not qualified to perform either closed or open reduction surgeries, and that he refers any patients with broken jaws to oral surgeons for these procedures.  (Id. at 7–8.)  However, he believed that "even a ten year old" could have seen that Specter's closed reduction surgery had "screwed up" Plaintiff's jaw alignment.  (Id. at 11.)

Viewing the evidence in the light most favorable to Plaintiff, this court must conclude

that Specter's closed reduction procedures left Plaintiff with a noticeable malocclusion.  The severity of this malocclusion and the extent to which it was caused by Specter's treatment, as opposed to a preexisting condition, are genuinely disputed.  Plaintiff and Dr. Jageman both testified that the malocclusion was severe, whereas Dr. Moczulski testified that it was minor, and his testimony is bolstered by Dr. Chung's records.  Similarly, there is a genuine dispute over whether Specter's procedures damaged Plaintiff's bridge.  Plaintiff testified that he still experiences pain from this damage, whereas Dr. Moczulski testified that the bridge was solid, and Dr. Chung's notes seem ambiguous on the matter.

While these factual issues remain disputed, they are not material to the resolution of Plaintiff's Eighth Amendment claims.  None of the evidence in the record, even when drawing all reasonable inferences in Plaintiff's favor, supports a finding that Specter acted with deliberate indifference.  Rather, the evidence merely supports a finding that Specter's closed reduction surgeries were unsuccessful.  The Eighth Amendment does not forbid medical professionals from merely acting unsuccessfully, but only forbids such unsuccessful treatment when it is undertaken out of a deliberate indifference toward the medical needs of a prisoner.  Plaintiff testified that Specter was "always aggravated," wouldn't listen to his concerns, and that Specter only performed a perfunctory examination during half of the checkup appointments.  (Doc. No. 291-1 at 52.)  But this kind of brusque behavior is far from sufficient to support an inference that Specter acted with the kind of recklessness required for an Eighth Amendment violation.  See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) ("Deliberate indifference . . . requires obduracy and wantonness . . . which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.") (internal quotation marks and citations omitted).

When Specter's behavior is considered in conjunction with his own notes, it is clear that Specter was highly skeptical of Plaintiff's complaints, and appeared to believe that Plaintiff was exaggerating the degree of his malocclusion.  (See Doc. No. 338 at 24.)  Yet Specter still performed procedures that were manifestly intended to correct Plaintiff's dental problems.  (See id.)  Even if Plaintiff could show that Specter should have known that persisting with this course of treatment would not correct Plaintiff's injury—an assertion which Plaintiff has produced very little evidence to support—this would still only support a claim of negligence rather than an Eighth Amendment violation.  See Rouse, 182 F.3d at 1.

### C.    Corrections' Defendants Motion for Summary Judgment

In their motion for summary judgment, Corrections Defendants principally argue that they should be granted summary judgment on the following grounds:

1) Plaintiff has failed to exhaust his administrative remedies against any of the Corrections Defendants regarding his claims for inadequate medical care, nor has he exhausted them against Defendant Muick for his claims regarding the attack by inmate Wright;

2) Plaintiff has failed to provide evidence showing that any Corrections Defendants acted with deliberate indifference to Plaintiff's serious medical needs;

3) Plaintiff has not provided expert testimony to support his medical malpractice claims against Corrections Defendants;

4) Plaintiff has not provided evidence to show that Corrections Defendants failed to protect him from the attack by inmate Wright;

5) the allegedly inferior quality of the pureed meals provided to Plaintiff does not rise to

the level of an Eighth Amendment violation.

(Doc. No. 332 at 7–8.)  This court will address each argument in turn.  Because this court will

dismiss all of Plaintiff's federal claims, it will decline to exercise jurisdiction over his state law

claims for medical malpractice.  (See infra at III.D.)

### i.        Exhaustion of Administrative Remedies

Corrections Defendants argue that Plaintiff has failed to exhaust his claims of inadequate

medical care and failure to protect because he failed to identify any of the Corrections

Defendants, with the exception of Defendant Muick, as persons with relevant information in his

grievances.  Because the identification of persons with relevant information is a mandatory

component of the Pennsylvania Department of Corrections grievance procedure, the failure to

name a defendant in a grievance constitutes a procedural default of any claim against that

defendant.  Spruill, 372 F.3d at 234.  However, this default may be excused if, in their response

to the grievance, the grievance officers themselves identify the defendant as someone with

relevant information.  See id.  Because the "purpose of the regulation here is to put the prison

officials on notice of the persons claimed to be guilty of wrongdoing," "the prison can excuse an

inmate's failure to do so by identifying the unidentified persons and acknowledging that they

were fairly within the compass of the prisoner's grievance."  Id.

In the instant case, Plaintiff filed and completed the appeal process of five grievances

relating to his medical treatment for his broken jaw.  (See Doc. No. 336 at 3.)  These grievances

mostly complain about his allegedly inadequate treatment by Dr. Specter, and only one of them,

grievance 306746, identifies any of the Corrections Defendants by name.  (See id. at 16–54).  In

grievance 306746, Plaintiff states generally that the medical and administrative staff failed to

take appropriate action to correct the inadequate treatment he was receiving from Specter, and also states that his complaints "have only been responded to with Authoritative Abuses and Adverse Retaliation treatment in the Infirmary by Alice Chipriano."  (Id. at 34.)  This statement can fairly be interpreted as alleging that Chipriano was one of the medical staff who was responsible for failing to take corrective measures to alleviate Plaintiff's serious medical problems.  However, nothing in Plaintiff's grievances about his medical care can be fairly interpreted as identifying any of the other Corrections Defendants, and so this Court must conclude that Plaintiff has procedurally defaulted his claims regarding his medical care against all the Corrections Defendants aside from Chipriano.

Plaintiff filed and completed the appeal process for one grievance regarding the attack upon him by inmate Wright, grievance 300818.  (Id. at 7–15.)  In that grievance, Plaintiff states that he saw Officer Marhelko speak to Wright on the morning before the attack and states that he believes Marhelko told Wright that Plaintiff was the reason Wright had been moved to a new cell.  (Id. at 8.)  Officer Muick, who is named in the complaint as someone who acted with Marhelko in instigating the attack by Wright and in failing to protect Plaintiff, is not named in the initial grievance.  (Id.)  Muick did file the initial response to the grievance, however, in which he states that he interviewed the various actors involved and informs Plaintiff that he made the decision to move Wright due to problems that Wright had with unit staff.  (Id. at 10.)  However, there is no indication in the response that Muick understood Plaintiff to be making any claims about his own behavior.  (Id. at 10.)  Because Plaintiff did not name Muick in his grievance, he has procedurally defaulted his claims against Officer Muick regarding the attack by inmate Wright, and nothing in the response to his grievance indicates a waiver of this default.

Finally, Corrections Defendants argue that Plaintiff has failed to exhaust his claim that the provision of his pureed meals violated the Eighth Amendment because they were nutritionally inadequate.  (Doc. No. 332 at 13.)  Corrections Defendants contend that, although Plaintiff filed a grievance regarding this issue, he later withdrew that grievance and did not appeal it to final review.  (Id.)  The evidence in the record supports this assertion, and thus this Court finds that Plaintiff has failed to exhaust his administrative remedy regarding that claim.  (See Doc. No. 334 at 80; see also Doc. No. 341 at 6-7.)

Thus, the only claims that Plaintiff has exhausted are: 1) his Eighth Amendment claim of failure to provide adequate medical care against Chipriano; 2) his medical negligence claim against Chipriano; 3) his claims that Officer Marhelko retaliated against him by telling inmate Wright that Plaintiff was the cause for that inmate being moved; 4) his Eighth Amendment claim that Marhelko instigated the attack by Wright; and 5) his Eighth Amendment claim that Marhelko failed to protect Plaintiff from the attack by Wright.  This Court proceeds to address whether Plaintiff has produced sufficient evidence to support those claims.

**ii.     Whether Chipriano Violated Plaintiff's Eighth Amendment Rights**

In order to show that Chipriano violated Plaintiff's Eighth Amendment rights, Plaintiff must show that she acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97 (1976).  As explained above, Plaintiff has produced sufficient evidence to establish a genuine issue over the material fact of whether his medical need at the time was serious.  (See supra at III.A.ii.b.)  The central question therefore is whether Plaintiff has produced sufficient evidence to support an inference that Chipriano acted with deliberate indifference toward that medical need.

29

In his deposition, Plaintiff stated that he sued Chipriano because "she's a medical administrator." (Doc. No. 334 at 48.) According to Plaintiff, it "was her call to get [him] appropriate medical care," but she instead decided to continue with the "substandard" care he was receiving from Specter. (Id.) The only other statement he makes regarding Chipriano is that she and Stanitis spoke to him in an attempt to resolve the issue he was having with his meals. (Id. at 37.)[7]

In her sworn declaration, Chipriano states that, when she worked at SCI-Mahanoy, she held the position of a "Registered Nurse Supervisor." (Doc. No. 340 at 10.) As a Registered Nurse Supervisor, her duties included "planning, organizing, directing and evaluating the administration of nursing care and treatment services, supervising professional, paraprofessional and non-professional nursing care personnel through observation, and orienting new employees." (Id.) Chipriano testifies that she "did not initiate dental or medical treatment for inmates or prescribe medication for them," but instead "deferred to the medical judgment of physicians and physician's assistants employed by the independent medical provider" and also to the "judgment of the dental professionals employed at SCI-Mahanoy." (Id. at 11.) Chipriano further testifies that she responded to one of the grievances Plaintiff filed regarding his treatment by Specter (in which she simply stated that Plaintiff was being treated by a specialist and that SCI-Mahanoy staff would follow Specter's recommendations), but that she does not recall treating him following the surgeries performed by Specter. (Id. at 12.)

Even assuming that Chipriano had some control over the type of dental treatment

---

[7] Plaintiff states that he was only bringing his claim regarding inadequate nutrition against Stanitis. (Id. at 36.) However, even if Plaintiff was attempting to bring this claim against Chipriano as well, this court again notes that Plaintiff has defaulted any claim regarding his allegedly inadequate meals. (See supra at III.C.i.)

Plaintiff received, Plaintiff has failed to produce any evidence that Chipriano's actions toward Plaintiff constituted deliberate indifference. Chipriano was a registered nurse, and not in any way an expert in dentistry or oral surgery. (Id. at 10.) As such, Chipriano was justified in deferring to the expertise of an oral surgeon regarding Plaintiff's treatment. See Estelle, 429 U.S. at 107; Spruill, 372 F.3d at 235. Even if Plaintiff is correct in his assertion that Specter failed to adequately treat his broken jaw, the failure of Chipriano to recognize that the treatment performed by a specialist outside of her field was inadequate does not amount to deliberate indifference.

Thus, because Plaintiff has not provided any evidence to show that Chipriano acted with deliberate indifference, this Court will grant summary judgment in favor of Chipriano on Plaintiff's Eighth Amendment claims. As discussed below, this court will dismiss Plaintiff's claims of medical negligence against Chipriano without prejudice. (See infra at ___.)

### iii.    Whether Officer Marhelko Instigated the Attack by Wright

Plaintiff brings two claims against Officer Marhelko based on the allegation that Marhelko instigated the attack on Plaintiff by Wright. First, Plaintiff claims that this instigation was a retaliation against Plaintiff for filing complaints about Wright, thus violating his First Amendment rights. (Doc. No. 1 at 14.) Second, Plaintiff claims that Marhelko violated his Eighth Amendment right to be free of cruel and unusual punishment by intentionally causing Wright to attack Plaintiff. (Id.) Corrections Defendants contend that Plaintiff has not produced any evidence to show that Marhelko was even aware that Wright was a serious threat to Plaintiff, much less that Marhelko purposely instigated the attack. (Doc. No. 332 at 20-23.) Because this

factual issue is an essential element of both claims, this court will address them jointly.[8]

In his complaint, Plaintiff claims that, around 6:00 AM on the morning of the attack by Wright, Marhelko entered Wright's cell and informed him of an "adverse action" that was going to take effect later that morning (presumably, that Wright was going to moved to another cell), and that Plaintiff was the reason for that action. (Doc. No. 1-1 at 4.) In his deposition, Plaintiff explains that on the morning in question he heard Marhelko go into Wright's cell and tell him and his cell mate that they were going to be moved to another cell block later that morning. (Doc. No. 334 at 18.) However, Plaintiff states that he could not hear what she said after that point, he could only hear "real low talking between her and who I perceived as Cody Wright." (Id. at 19.) Plaintiff later testified that, when Wright struck him, he stated it was "for getting him moved." (Id. at 24-25.) Aside from this testimony, Plaintiff has presented no other evidence from which one could infer that Marhelko told Wright Plaintiff was the cause for his move.

Plaintiff also testified that there was a history of antagonism between him and Wright. Plaintiff estimated that he had submitted five request slips complaining about Wright's behavior prior to the assault. (Id. at 21.) In at least one of these requests Plaintiff expressed that he wanted Wright moved to another cell block. (Id. at 20.) Plaintiff also stated that Wright attempted to fight with him on two previous occasions. (Id. at 27.) Plaintiff testified that Wright "portrayed himself as [a] fruit of Islam," and that he was hostile toward Plaintiff "because [he]

---

[8] In order to succeed on a retaliation claim, a plaintiff must establish three elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the plaintiff suffered an "adverse action" at the hands of prison officials; and (3) that the constitutionally protected activity was a "substantial or motivating factor" behind the adverse action. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). In order to succeed on a conditions of confinement claim, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012).

was white."  (<u>Id.</u> at 22–23.)

In her sworn declaration, Marhelko states that on that morning she simply informed Wright, from outside his cell, that he was scheduled to be moved later that morning.  (Doc. No. 340 at 20.)  Marhelko stated that handling inmate moves was part of her regular duties, that such moves are conducted on a regular basis for "various reasons," that there was "nothing unusual about Wright's transfer" to her knowledge, and that she was not involved in the decision to move Wright.  (<u>Id.</u>)  Marhelko also stated that she did not recall Plaintiff ever complaining to her about Wright and was not aware that Wright posed any serious risk of harm to Plaintiff prior to the assault.  (<u>Id.</u> at 21.)  In his response to Plaintiff's grievance about the assault, Muick stated that the move was in fact planned because Wright had recurring conflicts with unit staff.  (<u>Id.</u> at 32.)  Plaintiff himself also agreed that Wright "was a problem with everybody on that unit."  (<u>Id.</u>)

While Plaintiff's allegations have created some factual dispute over the material fact of what Marhelko said to Wright, Plaintiff has failed to produce any evidence in order to make this a genuine dispute.  All Plaintiff heard, aside from Marhelko telling Wright that he was going to be moved, was a "real low" exchange between Marhelko and Wright.  At first glance, Wright's statement that he was assaulting Plaintiff for getting him moved may appear to support Plaintiff's theory.  Yet Plaintiff's own testimony seriously undercuts this interpretation of the events.  As Plaintiff testified, he and Wright had a history of antagonism, and Wright attempted to fight him without provocation on two previous occasions.  Given this context, Wright's statement to Plaintiff does not imply anything about what Marhelko said to him except that Wright knew he was being moved.  No reasonable trier of fact could conclude from this scant evidence that Marhelko had told Wright that Plaintiff was the cause for his move.  Thus, this

Court will grant summary judgment in favor of Defendant Marhelko on this claim.  See

Anderson, 477 U.S. at 250–251.

### iv.    Whether Officer Marhelko Failed to Protect Plaintiff

In order to establish a claim for failure to protect, a prisoner-plaintiff must show that he

was "incarcerated under conditions posing a substantial risk of harm" and that the officials in

question acted with "deliberate indifference" toward the health and safety of the inmate.  Farmer

v. Brennan, 511 U.S. 825, 834 (1994).  In order to show that an official acted with deliberate

indifference, a plaintiff must show that the official was actually "aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists" and that the official also

drew that inference.  Id. at 837.  An official's "failure to alleviate a significant risk that he should

have perceived but did not, while no cause for commendation, cannot . . . be condemned" under

the Eighth Amendment.  Id. at 838.

In his deposition, Plaintiff testified that he was not aware of any other instances when

Wright assaulted a fellow inmate.  (Doc. No. 334 at 27.)  Plaintiff stated that Wright attempted to

fight with him on two previous occasions.  (Id.)  Plaintiff stated that he told this to one of the

block officers, but that he could not remember who the block officer was.  (Id.)  In her sworn

declaration, Officer Marhelko testified that she could not recall Plaintiff ever complaining about

Wright prior to the attack or stating that he was in fear of Wright.  (Doc. No. 340 at 21.)

Plaintiff has presented no evidence to show that Marhelko was in fact aware of a serious

risk posed by Wright against Plaintiff.  Even assuming that Marhelko would have witnessed

some sort of previous altercation between Wright and Plaintiff, Plaintiff himself testified that

Wright was "a problem with everybody" in the unit.  (Id. at 32.)  Given that Wright was

generally antagonistic, though not physically violent toward other inmates, there is no reason to believe that Marhelko would have inferred from his antagonism toward Plaintiff that Wright wanted to harm Plaintiff. The only evidence to support the notion that Marhelko knew of and yet disregarded the risk Wright posed toward Plaintiff is Plaintiff's theory that Marhelko told Wright that Plaintiff was the cause of Wright's move. Yet, as discussed above, this theory itself is almost entirely baseless. (See supra at III.C.iii.) Because Plaintiff has produced no evidence from which a rational trier of fact could infer that Marhelko actually knew of and disregarded the risk Wright posed to Plaintiff, this court will enter summary judgment in favor of Marhelko on this claim. See Anderson, 477 U.S. at 250–251.

### D.       Plaintiff's Claims of Medical Negligence

Federal district courts may exercise supplemental jurisdiction over state law claims where they are "so related" to the federal claims that "they form part of the same case or controversy." 28 U.S.C. § 1367(a). However, when the federal claims have all been dismissed, the district court "may decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c)(3). The Third Circuit has stated that, in general, once the federal claims in an action have been dismissed, the district court "should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of extraordinary circumstances." Angeloni v. Diocese of Scranton, 135 F. App'x 510, 514–15 (3d Cir. 2005) (quoting Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976)). Because this Court finds no extraordinary circumstances in this case to warrant the continued exercise of supplemental jurisdiction, it will dismiss Plaintiff's state law claims for lack of jurisdiction. This Court notes that the dismissal of Plaintiff's state law claims do not prejudice his ability to raise those claims in state court, as the statute of limitations period

has been tolled while those claims were pending before this Court.  28 U.S.C. § 1367(d); <u>see also</u> <u>Hedges v. Musco</u>, 204 F.3d 109, 123 (3d Cir. 2000).

**E.  Plaintiff's Motion to Supplement the Complaint**

Plaintiff now seeks to supplement his complaint to join Dr. William Chung as a defendant in this action.  (Doc. No. 305.)  Plaintiff's sole claim in the supplemental complaint appears to be that Chung failed to adequately respond to a subpoena he issued to Chung in which he requested all medical records Chung possessed pertaining to his evaluation.  (Doc. No. 305-1.)  There is no private cause of action for a violation of the Federal Rules of Civil Procedure. <u>See, e.g.</u>, <u>Shahin v. Darling</u>, 606 F. Supp. 2d 525, 539 (D. Del. 2009), <u>aff'd</u> 350 Fed. App'x 605 (3d Cir. 2009).  Therefore, Plaintiff's supplemental complaint is fundamentally defective and this Court will deny his motion.

This Court notes further that, to the extent that this motion should be construed as a motion to hold Dr. Chung in contempt of court for failure to comply with the subpoena, such a motion is meritless.  Plaintiff's subpoena requested that Chung produce "all medical records" pertaining to his evaluation of Plaintiff.  (<u>See</u> Doc. No. 275.)  A copy of Chung's records have been entered into evidence by Defendant Specter, and they contain several forms, including the form on which Chung wrote his evaluation, and two x-rays.  (Doc. No. 295-1; <u>see also</u> Doc. No. 305-1 at 5 (describing the material Chung provided Plaintiff).)  Considering the evidence that was produced, it appears that Chung was in fact in compliance with the subpoena, although the records that Chung in fact kept may not have matched what Plaintiff believed he would obtain, and thus there is no reason to hold Chung in contempt.  <u>See</u> <u>Southern Polymer, Inc. v. Astro Plastics, Inc.</u>, 3 08-332, 2010 WL 503073 (M.D. Pa. Feb. 8, 2010).

**IV.**      <u>**Conclusion**</u>

      For the reasons set forth above, this Court finds that Defendants are entitled to summary judgment on all of Plaintiff's claims arising under federal law.  As explained above, because this Court will dismiss all of Plaintiff's federal claims, it will decline to exercise jurisdiction over Plaintiff's remaining state law claims.  Plaintiff's motion to supplement the complaint will also be denied.  An appropriate order will follow.